UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSEPH JACKSON BAXTER, | Case No. 1:20-cv-00523-DKG |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| vs. | |
| SGT. BUFFALO, JESSICA GUEVARA, DEFENDANT PEHRSON, DEFENDANT JOHNSTON, DEFENDANT RODRIGUEZ, DEFENDANT McCLAIN, and DEPUTY COFMAN, | |
| Defendants. | |

**INTRODUCTION**

Plaintiff Joseph Jackson Baxter is proceeding on his First Amended Complaint in this prisoner pro se action. Dkt. 3. He asserts that Defendants used excessive force in two separate incidents while he was housed at the Twin Falls County Adult Detention Center. In the Successive Review Order, Plaintiff was authorized to proceed on excessive force claims against Defendants Sergeant (Corporal) Buffalo and Deputies Rodriguez, Cofman, and McClain for an incident occurring on November 6, 2019, and against Defendants Deputies Guevara, Johnston, McClain, and Pehrson for an incident occurring on

**MEMORANDUM DECISION AND ORDER - 1**

December 15, 2019. Dkt. 6.

Defendants' Motion for Summary Judgment addressing early defenses (Dkt. 16), Plaintiff's Motion to Compel (Dkt. 21), and Plaintiff's Motion for Extension of Time (Dkt. 22) are ripe for adjudication. All parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. Dkt. 15. *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Defendants assert that Plaintiff failed to exhaust his administrative remedies properly before filing his claims and that his claims are barred by *Heck v. Humphrey*, 12 U.S. 477, 486-87 (1994). They also assert that Plaintiff has not provided sufficient facts showing that Defendants violated his constitutional rights, entitling them to qualified immunity. The Court first will address discovery issues, then *Heck v. Humphrey*, then qualified immunity, and then exhaustion.

## PLAINTIFF'S DISCOVERY ISSUES

Plaintiff's "Motion to Compel" and "Reply to Motion for Summary Judgment" assert that Defendants provided him with surveillance video footage but no audio recording of the use-of-force incidents. Dkts. 21, 23. Defendants say they provided both. Dkt. 24. It is reasonable to assume that the video and audio files are one and the same, because modern digital video cameras are designed to record simultaneous audio and video. In fact, the video clips provided to the Court have video and audio. While the audio quality is poor, for the most part, the words are understandable. See Dkt. 16,

**MEMORANDUM DECISION AND ORDER - 2**

Exhibits K, L. There is nothing in the record or in Plaintiff's motion showing that Defendants are withholding a better, different, or separate audio recording. Dkt. 24, pp. 2-3. Accordingly, the request will be denied as moot.

Plaintiff also wants Defendants to provide him with the names of inmates who resided in the same cell block on November 6, 2019. Dkt. 21. The United States Court of Appeals for the Ninth Circuit has recognized that district courts have wide discretion in staying discovery in the context of qualified immunity determinations. *See Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). Plaintiffs may propound discovery "concerning issues that bear upon the qualified immunity defense, such as asking for information about the actions that the official actually took," but may not engage in general discovery on the merits of the claims. See *Crawford-E v. Britton*, 523 U.S. 574, 599-600 (1998).

The Court concludes that Plaintiff's request is related to qualified immunity, but the request would not produce evidence that could contradict the material facts depicted in the video; thus, the motion to compel will be denied. The video shows that no inmate directly witnessed the use of force incident in the isolated hallway. The video speaks for itself and cannot be countered by witnesses who were not present. Some inmates may have heard the incidents through their cell door, but it is unlikely that in 2023 any inmate would recall exactly what they heard on a specific date in 2019—other than yelling and a general tussle—to be able to directly contradict an unambiguous video recording of a

**MEMORANDUM DECISION AND ORDER - 3**

use-of-force incident lasting about one minute. The only inmate who may have seen or heard something, Plaintiff's cellmate, Terry Olsen, has written a letter describing his recollection, which the Court has considered. Dkt. 23-1.

For these reasons, the Court concludes that requiring disclosure of names of inmates housed in Plaintiff's cell block in 2019 is unnecessary, and the Motion to Compel will be denied.

## SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriate where a party can show that, as to a claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences which can be drawn from the

**MEMORANDUM DECISION AND ORDER - 4**

evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). When a videotape quite clearly contradicts the plaintiff's version of a use-of-force claim, courts should view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 381-82 (2007).

Pro se inmates are exempted "from *strict* compliance with the summary judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). At summary judgment, courts "do not focus on the admissibility of the evidence's form," but "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).

### *HECK V. HUMPHREY* DEFENSE

In *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994), the Supreme Court held that, where a favorable verdict in a civil rights action would necessarily imply that a plaintiff's conviction is invalid, he must first prove that the conviction or sentence has been overturned before the civil rights action can proceed. *Id.* Consequently, a civil rights claim for damages that, if successful, would imply that the conviction or sentence is invalid is not cognizable under § 1983. *Id.* If success would not imply invalidity of a conviction or sentence, "the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* at 487 (footnote omitted); *Edwards v. Balisok*, 520 U.S. 641

**MEMORANDUM DECISION AND ORDER - 5**

(1997) (applying same principle to civil rights actions challenging deprivation of prison good-time credits that would otherwise shorten an inmate's sentence).

The Court rejects Defendant's assertion that the December claim, which resulted in a jail disciplinary infraction, is barred by *Heck v. Humphrey*. See Dkt. 16-1, pp. 18-19. In *Ramirez v. Galaza*, 334 F.3d 850 (9th Cir. 2003), the United States Court of Appeals for the Ninth Circuit concluded:

> [W]e hold that the favorable termination rule does not apply to § 1983 suits challenging a disciplinary hearing or administrative sanction that does not affect the overall length of the prisoner's confinement. Where the prison's alleged constitutional error does not increase the prisoner's total period of confinement, a successful § 1983 action would not necessarily result in an earlier release from incarceration, and hence, does not intrude upon the "heart" of habeas jurisdiction. In such cases, the favorable termination rule of *Heck* and *Edwards* does not apply.

*Id*. at 858. Here, the record contains no evidence that the total period of confinement of Plaintiff, a pretrial detainee, was affected by the jail disciplinary action arising from the December use-of-force incident.

## QUALIFIED IMMUNITY DEFENSE

### 1.  Standard of Law

A motion for summary judgment on grounds of qualified immunity may be granted where the allegations on the face of the Complaint, taken as true, are sufficient to show that the qualified immunity test is met. *See Cooper v. Pickett*, 137 F.3d 616, 622

**MEMORANDUM DECISION AND ORDER - 6**

(9th Cir. 1997). In § 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate clearly-established federal rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). A qualified immunity analysis consists of two prongs: (1) whether the facts as alleged by plaintiff establish a violation of a constitutional right, and (2) whether that right was clearly established given the state of the law at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Courts may address either prong of the qualified immunity analysis first. *Pearson*, 555 U.S. at 236. The qualified immunity inquiry is "a pure question of law." *Elder v. Holloway*, 510 U.S. 510, 514 (1994). However, "under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

As to the first prong, the court considers whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. As to the second prong, a "case directly on point" is not necessary to show that the law was clearly established. Qualified immunity will not apply where existing precedent shows that "the statutory or constitutional question [is] beyond debate," *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (citation and punctuation omitted), and every reasonable officer in the same

**MEMORANDUM DECISION AND ORDER - 7**

circumstance would have understood "that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

At the heart of the qualified immunity analysis is the substantive law governing the particular claims at issue. The Fourteenth Amendment's Due Process Clause "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 (1989). To state an excessive force claim, a pretrial detainee must show that state actors used force knowingly or purposely against him, and that the force used was objectively unreasonable. *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015).

Importantly, the analysis does not include a "subjective standard that takes into account a defendant's state of mind." *Id*. at 396. It is enough that the government official applied force either knowingly or purposefully; whether it was a reasonable application of force is determined under an objective standard. Neither does the plaintiff's state of mind matter—whether the plaintiff *actually intended* to resist is not at issue—only how a reasonable officer would construe the circumstances. *Dockery v. Blackburn*, 911 F.3d 458, 463 (7th Cir. 2018).

Based on case law governing the excessive force question, a district court should do the following in its analysis:

- Consider how severe the disciplinary offense at issue was, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the

**MEMORANDUM DECISION AND ORDER - 8**

suspect was actively resisting. *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

- Consider "the need for the application of force, the relationship between the need and the amount of force that was used; the extent of the injury inflicted; and whether the force was applied in a good faith effort to maintain and restore discipline." *White v. Roper*, 901 F.2d 1501, 1507 (9th Cir. 1990).

- Account for "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained, and "accord[] wide-ranging deference" to government officials' "policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 540, 547 (1979)).

- Recognize that "[r]unning a prison [or jail] is an inordinately difficult undertaking," *Turner v. Safley*, 482 U.S. 78, 84–85 (1987), and that "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face," *Kingsley*, 576 U.S. at 399 (citation omitted).

- Recognize that officers "facing disturbances "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397.

- Consider the facts from the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397.

- When a taser was used, determine whether it was used during a period of active resistance, which generally is an acceptable use; or at a time when the plaintiff was passively resisting, *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 732 (7th Cir. 2013), or no longer was posing an immediate threat to the officers' or others' safety, *Deorle*, 272 F.3d at 1280, which are unacceptable uses. The immediate threat issue is the "'most important single element'" of the governmental interests at stake. *Mattos v. Agarano*, 661 F.3d 433, 444–45 (9th Cir. 2011) (citations omitted). Examples of active resistance include "kicking and flailing," *Clarett v. Roberts*, 657 F.3d 664, 674–75 (7th Cir. 2011); declining to follow instructions while acting in a belligerent manner, *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2010); and swatting an arresting officer's hands away while backpedaling, *Brooks v. City of Aurora*, 653 F.3d 478, 481 (7th Cir. 2011).

MEMORANDUM DECISION AND ORDER - 9

- Consider whether the force involved physical pressure applied on the plaintiff's limbs in increasing degrees, resulting in pain—which generally means that the nature and quality of the intrusion upon the plaintiff's personal security is less significant than most claims of force consisting of physical blows, cuts, or deadly force. *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994). *See also Eberle v. City of Anaheim*, 901 F.2d 814, 820 (9th Cir. 1990) (holding that it was reasonable as a matter of law to use a painful "finger hold" to remove a belligerent spectator from a sports arena).

- Consider whether the officers' conduct in question was "so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott*, 705 F.3d at 723–24.

### 2.  Factual Background and Analysis

Defendants' statement of undisputed facts is grounded upon the two jail surveillance videos, Defendants' incident reports, and the written declarations of Defendants. Plaintiff has set forth his version of the facts in his Amended Complaint and also in other filings responsive to the Motion for Summary Judgment, including a letter from Terry Olsen, Plaintiff's former cellmate.

The Court must draw all reasonable inferences in favor of Plaintiff, but, in doing so, it must accept the facts in the light depicted by the videotape. Plaintiff cannot contradict the content of the video recordings by his own testimony or that of his former cellmate. This is not to say that the videos cannot be contradicted *at all*, because they are from one angle and the audio quality is low. Nevertheless, the Court concludes that the video footage and sound recording are adequate and support Defendants' version of material facts.

MEMORANDUM DECISION AND ORDER - 10

### A. *November 6, 2019 Incident*

Plaintiff states that, on November 6, 2019, he returned to the jail after having jaw surgery and had not eaten in two days. He had a bandage wrapped around his jaw and head, as depicted in the video. Dkt. 16, Exhibit L. He was placed in segregation for his safety.

Deputy Thompson was assisting the jail's medical passer, attending to daily prescriptions and other medical needs of inmates. Plaintiff was informed that he would be receiving an Ensure protein shake to drink. Dkt. 16-16, p. 3, Supplemental Report of Derek Thompson. Plaintiff asked Thompson for some oatmeal. Plaintiff said he was on a "soft diet" and that oatmeal was "soft." See Dkt. 23-1, p. 1., Terry Olsen Letter; Dkt. 3-1, p. 4, Dr. Sherry Stoutin Affidavit. Thompson allegedly laughed and said, "If you wanted to eat, you shouldn't have had surgery." Dkt. 3, p. 11, Amended Complaint. Plaintiff became angry and "had words with the officer." *Id*. Plaintiff alleges that Thompson slammed Plaintiff's "bean slot" shut and radioed that Plaintiff had refused the Ensure. *Id*.

Plaintiff states that he did not refuse the Ensure. *Id*. He does not state what he said to Thompson. Plaintiff says that Thompson later stopped by Plaintiff's cell and said, "That's what I thought." *Id*. Plaintiff says that he decided to cover the surveillance camera in his cell "to try and get someone who w[ould] give him something to eat." *Id*.

The video shows that Plaintiff kicked the bean slot and door of his cell and then covered his cell camera with wet toilet paper. Dkt. 16, Exhibit L. Officer Thompson

**MEMORANDUM DECISION AND ORDER - 11**

stopped by Plaintiff's cell and asked, "*Doing okay*?" (he did not say, "That's what I thought."). *Id*. Plaintiff responded, "Yeah, I'm great." Dkt. 16, Exhibit L.

Deputy McClain reported that he received a call over the radio that Plaintiff had covered his camera and might be trying to flood his cell. Dkt. 16-16, p. 2. Officers came to Plaintiff's cell not to discuss his post-surgery diet, but to investigate the camera covering and potential flooding.

Plaintiff asserts that Defendants should have recognized that he was in a vulnerable condition from his recent surgery and was hungry. Dkt. 3, p. 12. Plaintiff asserts that when Buffalo opened the cell door and Plaintiff stepped out, the other three officers jumped on him from behind, punching and tasing him, causing his stitches to come apart. Dkt. 3, p. 12. Similarly, Plaintiff's cellmate says that "Joe [Plaintiff] stepped out and was talking to Officer Buffalo about getting something to eat, when, all of a sudden, the other officers jumped on him from behind." Dkt. 23-1, p. 1.

The video shows otherwise. Buffalo, Rodriguez, Cofman, and McClain approached Plaintiff's cell. Corporal Buffalo opened Plaintiff's cell door, with Deputies Rodriguez, Cofman, and McClain looking on. Dkt. 16, Exhibit L. Plaintiff came out of his cell. Buffalo said, "What's up?" Plaintiff responded, "Nothing." No talk about food or anything else occurred. *Id*.

Plaintiff saw the group of officers almost immediately. Without saying anything more, Buffalo and another officer placed their hands on Plaintiff's upper body to turn him

**MEMORANDUM DECISION AND ORDER - 12**

around toward the hallway to position him to be handcuffed. *Id*.

As soon as the officers touched him, Plaintiff immediately expressed fighting words—"You guys want to fight?"—and started to thrash around and physically struggle against the officers. Dkt. 16, Exhibit L. Deputy Coffman immediately called over the radio for control to secure cell 905 and open the 900 emergency exit to let medical staff out of the block. Dkt. 16-16, p. 3.

Deputy McClain reported the following in the incident report:

> After a struggle we were able to get inmate Baxter on the ground on his side, and we were able to get him to roll onto his stomach. Inmate Baxter was instructed to stop resisting and place his hands behind his back. He continued to resist and refused to put his hands behind his back. I began to deliver knee strikes to inmate Baxter's common peroneal, which produced little effect, and Corporal Buffalo performed a mandibular angle pressure point in an attempt to get him to comply. Deputy Rodriguez then told him to place his hands behind his back or he would be tased. After telling him several times to put his hands behind his back, Deputy Rodriguez activated her taser on Baxter's leg. After Deputy Rodriguez tased him, we were able to get his hands behind his back, and I placed handcuffs on him, and double locked them. Inmate Baxter began to spit blood in Deputy Coffman's direction, and she told him to stop.
>
> Inmate Baxter said no and spit again at Deputy Coffman. Corporal Buffalo told Deputy Rodriguez to go and get a spit mask. While she was gone I double checked the handcuffs for tightness. Corporal Buffalo and I tried to help inmate Baxter to his feet, and he refused to stand up, so we began to carry him. Deputy Coffman told him to stand up, and he stood and walked to holding [cell] three.

**MEMORANDUM DECISION AND ORDER - 13**

Dkt. 16-16, p. 2-6 (spelling and punctuation regularized).

This description matches the events recorded on the surveillance video. The other officers' descriptions of the incident are similar to each other and the video. Dkt. 16-16, pp. 2-6. There is nothing in the video that supports Plaintiff's or his cellmate's assertion that officers *jumped* Plaintiff *without any provocation*. Rather, the video makes it clear that the precipitating event to the officers' *reactive security measures* was Plaintiff saying, "You guys want to fight?," as he began a physical struggle against the officers who had attempted to turn him toward the hallway.

Plaintiff asserts that the officers did not try to de-escalate the situation before using force. However, the video shows that his immediate fighting words and physical struggle did not give Defendants a chance to do anything but react to subdue him. Use of immediate force to subdue Plaintiff was necessary under the circumstances, especially given that officers were aware medical staff were present in the unit.

Plaintiff asserts, "Defendant did not ask why the camera was covered or if it was me or my cell mate who covered the camera." Dkt. 23, p. 3. Plaintiff must not realize that, before he covered the cell camera, the camera footage shows him wetting toilet paper and placing it on the camera while he looks directly at it, while his cellmate is sitting on a bed reading a book. Dkt. 16, Exhibit L.

Plaintiff asserts that Buffalo should not have applied a "thumb to the back of the jawbone" technique to cause Plaintiff extreme pain right after his jaw surgery, which

**MEMORANDUM DECISION AND ORDER - 14**

made him cry. *Id.*, pp. 12-13. Defendants admit that, consistent with their training, they used various pressure point techniques to subdue Plaintiff. The techniques are designed to cause momentary pain but no lasting harm to the subject. It is impossible to tell from the video *how* Buffalo applied the technique, but the length of time Plaintiff was subjected to the pressure point pain directly correlated to the length of time he resisted.

Here, the Court considers that Buffalo was surprised by Plaintiff's sudden fight stance and had to react immediately; that he may not have considered whether to use the jawbone pressure point hold on a person who had recently undergone jaw surgery does not defeat the reasonableness of his choice of control techniques—it was Plaintiff who caused the officers to have to react so suddenly and without forethought. The maximum length of time of the entire incident was just over one minute. Plaintiff does not assert that he suffered any lasting injury from the painful hold. Case law makes it clear that pressure point holds are preferable methods of regaining control of inmates.

Plaintiff also alleges that Buffalo hit him. It does not appear from the video that Buffalo intentionally struck Plaintiff with a fist, but it is possible that the angle of the video did not show Plaintiff being hit. There is no evidence of a bruise or cut to show that it was more than de minimis if a punch did occur. The allegation that Plaintiff suffered "extreme pain" directly afterwards and continuing pain for perhaps a few days, Dkt. 3, p. 11, is not enough to overcome qualified immunity in this precarious circumstance. Plaintiff asserts that the officers "*could* have caused him to have more surgeries," not that

**MEMORANDUM DECISION AND ORDER - 15**

they did. See Dkt. 3, p. 12. It is unfortunate that Plaintiff's stitches came apart, but that is his own fault from his decisions to cover his cell camera and start a fight with officers. Plaintiff has produced no medical records showing that he suffered anything except de minimis injuries, and he has submitted no medical opinion separating pain arising from the jaw surgery from pain arising from the use of force incident.[1]

Deputy Rodriguez left the scene to get a spit mask to put on Plaintiff because he was spitting blood on the officers. They placed the spit mask on him and began to carry him away because he refused to walk. Rodriguez ordered him to walk, and he did— without any difficulty or apparent injury. Plaintiff's cellmate speculated, "I thought they hurt him really bad because there was blood all over the floor." Dkt. 23-1, p. 2. The fact that there was blood on the floor does not create a genuine dispute of material fact. It is undisputed that Plaintiff was spitting blood on officers. It is undisputed that the incident was extremely short, and Plaintiff has not provided any facts showing that, during the incident, he suffered cuts or lacerations causing significant bleeding.

_____

[1] Defendant McClain reported: "Sgt. Chris Hogan called for the ambulance to come and evaluate Baxter. At approximately 2039 hrs, he refused medical treatment. Sgt. Hogan then called the on call nurse Lyndsey to come in and evaluate Baxter. Initially, Baxter refused to see the nurse, then when we told him we were going to remove his handcuffs, he requested to see Lyndsey. During the conversation, Baxter argued with the nurse stating he wanted to eat. At 2102 hrs, Baxter's handcuffs were removed. Later in the evening, Baxter was moved back to 904. At approximately 2259, Baxter requested to go to the Emergency Room or he would pick another fight. Medical was notified of his concerns and they instructed to give him Tylenol and ice." Dkt. 16-16, p. 2 (spelling regularized). Plaintiff, on the other hand, asserts that he was in extreme pain from "being hit and having all of Buffalo's pressure being applied to his broken jaw" on the day of the incident and that he was not given any pain medication until the next day. Dkt. 3, p. 13.

**MEMORANDUM DECISION AND ORDER - 16**

Overall, the video shows that the officers acted quickly, effectively, and with care and dignity—even though Plaintiff was spitting blood on them during the confrontation. To their credit, neither they nor Plaintiff suffered a serious injury. Buffalo has declared that the officers involved "complied with the applicable use of force policy, including the use of mandibular pressure techniques and a taser." Dkt. 16-15, p. 2. The video supports that declaration.

Drawing from relevant considerations in evaluating whether the use of force was reasonable or excessive, the Court notes that covering a cell surveillance camera is a serious offense, preventing jail officials from monitoring that inmate's cell. Plaintiff started a fight with deputies immediately and continued to actively resist their efforts to subdue him. Force was needed immediately to prevent Plaintiff from escaping or from injuring medical staff or the officers. The relationship of the forced used to the need for force was reasonable, consisting only of taking Plaintiff to the ground, pressure point techniques, a possible hand strike, and a short taser use to the leg during Plaintiff's active resistance. The video makes it clear that the officers worked in a good faith effort to restore discipline by preventing Plaintiff from fighting with them and by completing removal of Plaintiff from the cell. There was an immediate threat to medical personnel in the unit, as Deputy Coffman noted twice in her report, and an immediate threat to the investigating officers. See Dkt. 16-16, p. 4; Dkt. 16, Exhibit L.

**MEMORANDUM DECISION AND ORDER - 17**

The Court concludes that the record shows no genuine dispute of material fact that would call into question whether the use of force was objectively reasonable under the circumstances. Far from being excessive, egregious, or unreasonable, the use of force depicted in the video was a model of reasonable response to an inmate's invitation to fight in both word and body language. Two officers worked together to subdue Plaintiff's legs. Once that was done, but Plaintiff continued to disobey commands to put his arms behind his back, he was tased on the leg, which aided in subduing him. The video confirms that officers were using pressure point techniques, consistent with their training; these techniques had to be chosen without forethought and were reasonable, given that they are designed to inflict no lasting injury and Plaintiff suffered no lasting injury. The entire incident was extremely brief, just over one minute, thanks to the deputies' quick and effective action, and neither the officers, nor medical staff, nor Plaintiff was seriously injured.

No governing case law clearly establishes that an officer may not use the type of force seen in the video under like circumstances. Therefore, the Court concludes that Defendants are entitled to qualified immunity.

### B.  December 15, 2019 Incident

Plaintiff alleges that Sergeant Guevara, Officer Pehrson, Officer McClain and Officer Johnston choked and tased him without warning. Plaintiff says that he was trying to comply with the officers, but Officer Johnston kept trying to grab him, even though

**MEMORANDUM DECISION AND ORDER - 18**

Plaintiff asked Johnston not to touch him and asked Johnston what he was doing. Plaintiff alleges that when he pulled away from Officer Johnston for a third time, Johnston allegedly grabbed him and choked him, taking him to the ground. Plaintiff says that Sergeant Guevara began tasing him without any warning, as Officers McClain and Johnston held him to the floor and put cuffs on him. Dkt. 3, pp. 13-14.

The video of this incident begins by showing that Plaintiff was in the common room talking on the phone when the inmates were required to immediately return to their cells. He refused to comply with officers' instructions to stop his phone call and leave the dayroom. All other inmates complied and left the room. Officers stood by for a short time to allow him to choose to comply, but he did not. One officer helped him hang up the phone. As the officers and Plaintiff left the room, Deputy Johnson touched Plaintiff's arm. The next portion of the video shows Defendants Johnston, Guevara, and Fink escorting Plaintiff down the hallway without touching him. Dkt. 16, Exhibit K.

As an alternative to using handcuffs, Defendants Johnston and Guevara attempted to employ a prisoner escort maneuver known as the "police lead," in which deputies place an inmate's hands behind his back to maintain control of the inmate and ensure the safety of staff and the inmate. Dkt. 16-15, p. 2. After they passed through doors and began walking down another hallway, Johnston, the male officer on Plaintiff's left, took Plaintiff's left arm. Plaintiff said, "Get your fucking hands off me," speaking right into Johnston's face. Guevara, the female officer on Plaintiff's right, took his right arm.

**MEMORANDUM DECISION AND ORDER - 19**

Plaintiff turned to Johnston and said, "You're not allowed to fucking touch me, Mother Fucker." Dkt. 16, Exhibit K. The deputy said, "Really?" Plaintiff replied, "Yeah, really." *Id*.

Suddenly, Plaintiff began to struggle with three officers surrounding him. He yelled, "Do you guys want to get fucking crazy?" and quickly spun around. Officer Guevara stood back as the two male officers quickly grabbed Plaintiff and took him to the floor. *Id*. The officers lay down on top of Plaintiff to gain control and yelled, "Stop resisting," as Plaintiff flailed underneath them. Guevara then cautiously approached and removed her taser. She yelled, "Get your hands behind your back!" A male deputy used the knee strike technique. A male office said, Get your hands behind your back now!" At that point, the officers still did not have Plaintiff's upper body under control, and Plaintiff still had not put his hands behind his back. A fourth deputy rushed to help. Plaintiff yelled, "How the fuck am I supposed to put my hands behind my back when [inaudible]." Guevara then tased Plaintiff with a drive stun on his lower back. See Dkt. 16-12, p. 3.

Plaintiff then said, "Why are you tasing me?" The fourth deputy said, "Put your hands behind your back." As soon as Plaintiff was tased, he calmed down. Plaintiff then asked, "Why are you tasing me? Why are you tasing me? You got my hands off on the side of my fucking leg?" The male deputy responded (indecipherable), and Plaintiff said calmly, "Well, I'm trying to get it there but you're in the way." Dkt. 16, Exhibit K. All the parties were silent and still. Plaintiff was handcuffed. Guevara said, "Stand up."

**MEMORANDUM DECISION AND ORDER - 20**

Plaintiff stood with the help of the officers, and the officers walked him away. *Id*. To the officers' credit, the entire episode from Plaintiff's verbal outburst to when the officers help Plaintiff off the ground lasted about 58 seconds. *Id*.

Plaintiff contends that a deputy was choking him, an act of excessive force. The video shows that, when Plaintiff turned and said, "Do you want to get fucking crazy?," a male officer reacted immediately, grabbing Plaintiff's upper body. The officer's placement of his arm across Plaintiff's throat was largely the result of the direction Plaintiff turned and where the officer was standing when Plaintiff surprised the officer and began struggling. That portion of the video lasts about two seconds. The video shows that Plaintiff was talking normally directly after being "choked." All of these factors show that any "choking" was a de minimis effect of the officer trying to immediately subdue Plaintiff's erratic and dangerous behavior.

Plaintiff asserts that he was not given a warning before being tased. Plaintiff was told many times to stop resisting and to put his hands behind his back, and he did not. Use of the taser in this circumstance was consistent with case law: it was used very briefly during a period of active resistance—flailing, refusing to following instructions, and acting in a belligerent manner. Officers had to act quickly given Plaintiff's extreme actions—it is unclear whether his intent was to harm the officers or try to escape. It was the short tasing that caused the entire scene to shift from yelling and flailing to a calm

**MEMORANDUM DECISION AND ORDER - 21**

stillness, quickly ending the incident. Under these circumstances, lack of a warning before the use of a taser was not unreasonable, nor was use of the taser unreasonable.

Plaintiff also asserts that officers were preventing him from complying with the order to put his arms behind his back because they were holding onto his hand. While the position of the officers' bodies surrounding Plaintiff in the video masks whether Plaintiff was trying to place his arms behind his back, the entirety of the video shows that Plaintiff was still resisting at the time he was tased, and that as soon as he was tased he stopped resisting. Four deputies were unable to get Plaintiff under control before the tasing. The video shows that officers had to react quickly to gain control of Plaintiff. They were not required to relinquish what control they had over a flailing inmate (holding onto his hand) when the inmate had just displayed an unexpected episode of violence, with continuing noncompliance.

As discussed in *Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017), and *Dockery v. Blackburn*, 11 F.3d at 468, the use of a taser in drive stun mode and restraint techniques are lawful and appropriate when an inmate ignores officers' directives, resists officers' efforts to subdue him once they attempt to do so, refuses to submit to being handcuffed, and does not react to the taser as if he were stunned or incapacitated. The following description of a use-of-force incident in *Dockery* shows that the court should look to the totality of facts in a tense, uncertain, and rapid-evolving resistance setting:

**MEMORANDUM DECISION AND ORDER - 22**

> [The] suspect … backpedaled and swatted at a police
> officer who was attempting to arrest him. The suspect then
> stood still and "passively" faced the officers for a few
> seconds but did not manifest submission, so the officer
> pepper sprayed him. 653 F.3d at 487. We concluded that the
> officer was entitled to qualified immunity *because the
> plaintiff "ha[d] not submitted to the officer's authority, ha[d]
> not been taken into custody[,] and still arguably could [have]
> pose[d] a threat of flight or further resistance." Id.*

911 F.3d at 468 (discussing *Brooks v. City of Aurora*, 653 F.3d 478, 487 (7th Cir. 2011)

(emphasis added).

Plaintiff's case is similar to that description: the use of the taser came after his legs

had been secured, but before his arms had been secured, and officers were not required to

let loose his hand until Plaintiff stopped resisting altogether. Further, while the officers

worked very well as a team, the officer who told Plaintiff to put his hands behind his back

and used the taser when he did not comply was *not* the same officer who was holding

Plaintiff's hand down. Each officer acted reasonably as part of a team under dangerous

circumstances, and the team as a whole subdued Plaintiff in less than a minute. No case

clearly establishes that an officer may not use the types of force seen in the video of the

December 2019 incident. Therefore, the Court concludes that Defendants are entitled to

qualified immunity.

**MEMORANDUM DECISION AND ORDER - 23**

**FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES DEFENSE**

### 1.    Introduction

Defendants assert that Plaintiff failed to exhaust his administrative remedies

before filing his lawsuit. They argue:

> Plaintiff's claims are subject to dismissal under the
> plain language of the PLRA because he failed to follow the
> TFCJ's grievance procedures prior to filing this lawsuit. The
> PLRA required Plaintiff to file an Inmate Request alleging an
> excessive use of force and, if that was ineffective, to file a
> Grievance Form containing specific information, including
> the precise nature of his complaints and specific relief sought.
> That Grievance Form must have been filed within fourteen
> (14) days of the incidents in question, which occurred on
> November 6, 2019 and December 15, 2019. If Plaintiff had
> filed timely Grievance forms, the PLRA also required him to
> file Grievance Appeals, satisfying the three-step procedure
> for exhausting his administrative remedies. Plaintiff failed to
> file a timely Grievance Form with regard to the November 6,
> 2019 incident, and failed to file a timely appeal with regard to
> the December 15, 2019 incident.

Dkt. 16-1, p. 10.

### 2.    Standard of Law

The PLRA requires prisoners to exhaust all available administrative remedies

within the jail system before they can include their claims in a new or ongoing civil rights

lawsuit challenging the conditions of confinement. 42 U.S.C. § 1997e(a); *Cano v. Taylor*,

739 F.3d 1214, 1220-21 (9th Cir. 2014) (a claim may be exhausted prior to filing suit or

during suit, so long as exhaustion was completed before the first time the prisoner sought

**MEMORANDUM DECISION AND ORDER - 24**

to include the claim in the suit). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The defendant bears the ultimate burden of proving failure to exhaust. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).

Confusing or contradictory information given to a prisoner "informs [the] determination of whether relief was, as a practical matter, 'available.'" *Brown*, 422 F.3d at 937. Administrative remedies will be deemed unavailable and exhaustion excused if the inmate had no way of knowing the prison's grievance procedure, if the prison improperly processed an inmate's grievance, if prison officials misinformed an inmate regarding grievance procedures, if the inmate "did not have access to the necessary grievance forms within the prison's time limits for filing the grievance," or if prison staff

**MEMORANDUM DECISION AND ORDER - 25**

took any other similar actions that interfered with an inmate's efforts to exhaust. *Albino*, 747 F.3d at 1173. In addition, if prison officials ignore a procedural problem and render a decision on the merits of the grievance at each available step of the administrative process, an inmate's claim is considered properly exhausted. *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016).

### 3.      Factual Background and Analysis

Defendants bear the burden of showing that Plaintiff failed to exhaust his administrative remedies before filing this civil rights lawsuit. When a plaintiff raises issues relevant to the question of whether exhaustion was properly completed or whether it was excused, the defendant must adequately address those issues to prevail.

### A. *November 6, 2019 Incident*

Defendants assert that Plaintiff was required to file a grievance about the November 6, 2019 incident within 14 days, which would have been November 20, 2019. Defendants assert that the first inmate request that mentions the November 5, 2019 incident was filed on December 31, 2019. Dkt. 16-10, p. 2, Exhibit G. Plaintiff wrote, "Who were the officers involved in the use of force on 11/6?" *Id*. (spelling and punctuation regularized). He was provided the names in the response. *Id*. Clearly, the response granted the request to provide the names. At that time, Plaintiff did not, however, raise the issue of excessive force and seek a resolution, such as, "the officers should not have jumped me when I walked out of my cell," or "the officers should not

**MEMORANDUM DECISION AND ORDER - 26**

have tased me," and "were the officers disciplined?" or "officers should be trained not to tase inmates."

The Court concludes that no timely grievance was filed and the late grievance did not address the incident but merely sought information preliminary to filing a grievance about the incident. If Plaintiff was not satisfied with the response about who was involved in the use of force incident, then he was required to file a grievance appeal. That, he did not do.

To exhaust a claim, a prison grievance must have the same subject and same request for relief as the plaintiff's complaint, under a liberal construction of both. *See, e.g., Hill v. McGrath*, 2008 WL 3823042, at *2 (N.D. Cal. Aug. 13, 2008). Otherwise, the exhaustion requirement is not satisfied. *See Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (Griffin's grievance appeals did not mention the alleged disregard of his lower bunk assignment, instead continuing to demand a ladder or stool to access the top bunk; therefore, his claims that prison officials disregarded an order for a lower bunk was not properly exhausted). *See also McCollum v. California Dep't of Corr. & Rehab.*, 647 F.3d 870, 876 (9th Cir. 2011) (The district court correctly concluded that the claims by Spooner, Iloff, Dacus, and Mourland failed to alert CDCR that their grievances sought redress for the absence of a paid Wiccan chaplaincy—an allegedly unexhausted claim in the complaint. In particular, "Spooner's grievance stated that CDCR did not have a full-time chaplain, but did not suggest a full-time chaplain was required, instead proposing that

MEMORANDUM DECISION AND ORDER - 27

Spooner himself serve as an inmate minister. Iloff's grievance alleged religious discrimination in the form of unequal access to worship spaces. Dacus similarly grieved of inadequate access to sacred items and generally inadequate accommodations of minority religions. Mourland alleged insufficient access to Wiccan vendors of religious materials. These grievances give notice that inmates allege the prison policies fail to provide for certain general Wiccan religious needs and free exercise, but do not provide notice that the source of the perceived problem is the absence of a paid Wiccan chaplaincy.").

Because Plaintiff did not grieve the incident itself, his claim is subject to dismissal without prejudice. However, he cannot pursue it in the future as a result of the Court's alternative ruling that Defendants are entitled to qualified immunity, which warrants a dismissal with prejudice.

### B. December 15, 2019 Incident

On December 16, 2019, Plaintiff submitted a request:

> "Want to know why your CO's think it's OK to put hands on when I'm complying with their orders; they had no reason to use excessive force with me. I was walking down the hall when the C/O grabs me. I asked him not to grab me and they beat me up and tased me again. This is in violation of my due process rights.

Dkt. 16-6, p. 2, Exhibit D (spelling and punctuation regularized).

**MEMORANDUM DECISION AND ORDER -  28**

The same day, Officer Bingham responded: "All use of force situations are reviewed by a supervisor and a board, if any wrong doings are found they will be addressed accordingly." *Id*.

On December 17, 2019, Plaintiff tried again with this request: "While walking down the hallway I was grabbed by staff. I asked him not to touch me and he did it again. I was complying with them; there was no need for him to grab me; it's a violation of my rights." Dkt. 16-7, p. 2, Exhibit E (spelling and punctuation regularized).

Office Bingham forwarded the request to Officer Wiggins, because Bingham had already "answered the request he is grieving." *Id*. Wiggins responded to Plaintiff: "As informed any use of force will be reviewed by the Administration. Misconduct if any will be dealt with accordingly. *Id*.

Neither response said that Plaintiff's request was granted or denied. Plaintiff tried a third time on March 27, 2020, with a request that asked: "Was wondering what happened to the officers who beat me up on 11/6/19 and 12/15/19 if anything??????". Dkt. 16-10, p. 2, Exhibit H. Officer Kimball responded: "This issue has been resolved through the administrative process." *Id*.

The Court concludes that the responses to Plaintiff's requests were unclear and confusing. None of the grievance responses told Plaintiff whether his grievances were granted or denied, but instead, the responses left him hanging: was his request removed from the grievances system and placed into a different administrative review system, and

**MEMORANDUM DECISION AND ORDER - 29**

was he ever going to get an answer? A prisoner should not have to guess at what to do next. Plaintiff made two efforts to begin the process, receiving confusing information as to what, if anything, he should do next. He made one follow-up effort, to which he received an equally confusing response. Again, his request was neither granted nor denied, and he was not told how the issue was resolved, only that it was resolved.

The Court finds and concludes that jail officials' responses were confusing enough to render the grievance process unavailable to Plaintiff as to the December 15, 2019 incident. However, as determined above, his claim fails on qualified immunity grounds and will be dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1. Plaintiff's Motion to Compel (Dkt. 21) is DENIED.

2. Plaintiff's Motion for Extension of Time to File Response to Motion for Summary Judgment (Dkt. 22) is GRANTED. The Court has considered all of Plaintiff's filings.

3. Defendants' Motion for Summary Judgment (Dkt 16) is DENIED on grounds of failure to exhaust the December 2019 incident and the *Heck v. Humphrey* bar, is DEEMED MOOT on grounds of failure to exhaust the November 2019 incident, and is GRANTED on grounds of qualified immunity. The First Amended Complaint (Dkt. 3) is DISMISSED with

MEMORANDUM DECISION AND ORDER - 30

prejudice.

DATED: February 1, 2023

Honorable Debora K. Grasham
United States Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 31**